`

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**


| | |
|---|---|
| **KIMBERLY LEWIS ROGERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 3:14-cv-1322** |
| ) | **Judge Aleta A. Trauger** |
| **SOCIAL SECURITY** ) | |
| **ADMINISTRATION,** ) | |
| ) | |
| **Defendant.** ) | |


## <u>MEMORANDUM</u>

Pending before the court is the plaintiff Kimberly Lewis Rogers' Motion for Judgment on

the Administrative Record (ECF No. 13), to which the defendant Social Security Administration

(SSA) has responded (ECF No. 14), and the plaintiff has filed a reply.  (ECF No. 15.).  Upon

consideration of the parties' briefs and the transcript of the administrative record (ECF No. 11),[1]

and for the reasons given herein, the plaintiff's Motion for Judgment on the Administrative

Record will be denied and the decision of the SSA will be affirmed.

### I.  Magistrate Judge Referral

To avoid any further delay in the resolution of this matter, the court will VACATE the

referral to the magistrate judge.

---

[1] Referenced hereinafter by "Tr." followed by a page number which can be found in bolded font at the
lower right corner of the transcript.

## II.  Introduction

The plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act[2] on April 21, 2010, (Tr. 14), alleging disability onset as of December 30, 2010 (*id.*), due to fibromyalgia, chronic migraines and high blood pressure, (Tr. 136).  The SSA initially denied her claim to benefits on December 30, 2010 and upon reconsideration on November 30, 2011.  The plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ).  The ALJ heard the case on October 10, 2012, when the plaintiff appeared with counsel and gave testimony.  (Tr. 25-62.)  Testimony was also received from a vocational expert.  (*Id.*)  At the conclusion of the hearing, the matter was taken under advisement until January 4, 2013, when the ALJ issued a written decision finding that the plaintiff was not disabled.  (Tr. 14–20.)  That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2. The claimant has not engaged in substantial gainful activity since January 10, 2010, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: fibromyalgia and headaches (20 CFR 404.1520(c)).

4. The impairments are established by the medical evidence and are "severe" within the meaning of the Regulations because they cause limitations in the claimant's ability to perform basic work activities.

---

[2] The Act and implementing regulations regarding Disability Insurance Benefits (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and SSI (contained in Title XVI of the Act and 20 C.F.R. Part 416 of the regulations) are substantially identical.  *Barnhart v. Thoma*s, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that, "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.")  The court cites to the regulations interchangeably throughout this opinion.

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

6. The claimant is capable of performing past relevant work as a sales representative, communications sales representative, account clerk and apartment manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from January 10, 2010, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 16, 19- 20.)

On April 15, 2014, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1-6), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. *Id.*

### III. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

The longitudinal medical record of evidence shows that the claimant has been treated for headaches and fibromyalgia. The claimant has been treated with Fioricet, which she had been instructed to reduce her Fioricet intake. She has also been noted to use Topamax, which has been noted to be beneficial. In addition, she has been prescribed a Fentanyl patch to use every three days, which was also noted to be beneficial. While the claimant has tested negative for rheumatoid arthritis, she has been continually treated for fibromyalgia, as she experiences multiple joint pains (left greater than right) and decreased grip in her left (non-dominant) hand. However, she has been noted to have normal stability, normal strength and tone, and no effusion in her extremities. (Exh 5F)

The claimant has also been treated by a headache specialist, but eventually stopped seeking treatment from this specialist, as she started receiving treatment through pain management. The pain management provider treated the claimant for headaches and fibromyalgia. The claimant began to be treated with opiates and methadone, as well as some other medications. The claimant has been noted to be positive for joint stiffness and joint pain. However, the claimant has been continually noted to have no neurological deficits. It is important to note, the

3

claimant underwent nerve blocks, which she explained to be beneficial in relieving her joint pain. In fact, she explained that her functioning had increased. Unfortunately, the claimant was eventually discharged from the pain management clinic, as she had a positive drug screen for a non-prescribed drug and also had an incorrect number of pills. While the claimant was discharged from pain management, it is important to note, the claimant did experience relief through pain management. As she had a decrease in pain and a decrease in headaches, which she noted had become less intense and less frequent. (Exhs 10F, 11F and 12F)

The claimant has also undergone a physical consultative examination. The claimant was noted to have normal range of motion throughout all of her extremities. However, she was noted to have chronic fatigue, decreased energy, morning stiffness in her hands, wrists, elbows, and shoulders, and pain in her back, neck, arms, hips, and legs. (Exh 6F)

In terms of the claimant's alleged debilitating physical conditions, the evidence does not support that these conditions are as limiting as alleged. The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. In addition, the claimant is apparently able to care for young children at home, which can be quite demanding physically, without any particular assistance. As noted above, the claimant cooks, cleans, has no difficulty with self-care, cares for her 7-year-old child, volunteers, and drives without difficulty. The claimant also plays catch with her son. The claimant also received unemployment benefits until they ran out, which indicates that she had explained that she was willing, ready, and able to work. In fact, the claimant has looked for jobs, which also indicates that she is willing, ready, and able to work. Also, the claimant has received limited treatment and the medical records do not show the claimant to be as physically limited as she alleges. The claimant has no neurological deficits and a full range of motion in all extremities. In addition, she has received benefits from several different forms of treatments, including nerve blocks, pain medication, and the direct application of heat. The claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the claimant's favor, but the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms. However, the claimant was also discharged from pain management for the alleged misuse of medication and having an incorrect number of pills.

As to the opinion evidence, the undersigned afforded little weight to the claimant's treating physician's opinion and the consultative physical examiner's opinion. The treating physician opined the claimant is unable to work because she has difficulty getting out of bed due to fatigue and pain. The consultative examiner opined the claimant would be able to perform sedentary work. Both of these opinions are inconsistent with the claimant's testimony that she can perform

a wide range of daily activities, including caring for a 7 year old child, cooking, cleaning, driving, playing catch, and volunteering. (Exhs 5F and 6F)

The undersigned has considered the opinions of the State Agency medical consultants who provided physical and mental residual functional capacity assessments. These opinions have been accorded significant weight insomuch as they are consistent with the medical evidence of record and support the ultimate finding of "not disabled" in this case. The physical opinions were given great weight as the findings are consistent with the medical record of evidence, which shows the claimant to have no neurological deficits, the ability to ambulate successfully, and no limitations in her range of motion. The psychiatric opinions were given great weight, as there are no complaints of any psychiatric conditions. (Exhs 2F, 3F, 4F, 8F, and 9F)

Based on the limited medical record of evidence, as described above, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant must avoid workplace hazards such as unprotected heights and moving machinery.

(Tr. 18–19.)

## IV. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc.*

*Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets

the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert

testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. The Plaintiff's Statement of Errors

The plaintiff alleges that the ALJ erred in not giving the opinion of her treating physician, Rand Hayes, M.D., controlling weight and in failing to sufficiently explain why Dr. Hayes' opinion was not entitled to controlling weight.

On May 26, 2011, Dr. Hayes wrote a letter in which he stated:

> I am writing on behalf of Kimberly Rogers as her primary care physician. Kim has been coming to me for approximately 8 years; therefore I feel I have an accurate view of her overall health. Currently she has several medical issues which include fibromyalgia, hypothyroidism, hypertension, severe chronic daily migraine headaches and a non-specific polyarticular polyarthralgia/polyarthritis. *Patient states that she often has episodes where she has difficulty simply getting out of bed due to fatigue and pain.* With this type of symptomatology, it makes it very difficult for her to keep any type of job. According to Ms. Rogers she has already lost two jobs due to these same reasons, while living briefly back in Alabama. At the present time she has been very appropriate with her medication regime and she follows with both me and Dr. Steigelfest of rheumatology regarding these issues. Her inability to work is neither willful nor voluntary but unfortunately is due to her underlying current chronic medical problems. Please do not hesitate to call if there are any further issues about her medical condition as I will be happy to discuss these issues with you as long as I have her written permission.

(Tr. 235, emphasis added.)

The ALJ is generally required to accord the opinion of a claimant's treating physician substantial deference. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). Such deference, however, is due only when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" before the ALJ. 20 C.F.R. § 404.1527(c) (2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*, 246 F.3d at 773. An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Comm'r Soc. Sec. Admin*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all."). Ultimately, the determination of disability is "the prerogative of the Commissioner, not the treating physician." *Warner*, 375 F.3d at 390 (quoting *Harris v. Heckler*, 726 F.2d 431, 435 (6th Cir. 1985)). As such, a treating physician's opinion that a patient is disabled is not entitled to any special significance. See 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 980 n. 1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician.").

If the ALJ decides not to accord the opinion of a treating physician controlling weight, the ALJ relies on a number of factors—including the length of the treatment relationship and frequency of evaluation, the nature and extent of the treatment relationship, how well supported by medical evidence the treating physician's opinion is, the consistency of the treating physician's opinion with the record as a whole, and whether the treating physician is a

specialist—to determine how much weight to give the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2)-(6). Where the ALJ finds that the treating physician's opinion is not entitled to controlling weight, the regulations require the ALJ to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). Consequently, a decision denying benefits has to state "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188 at *5 (1996). This procedural safeguard "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.

Although courts prefer that they do so, ALJs need not explicitly mention in their decisions every factor under 20 C.F.R. § 404.1527(c) when determining the weight to give the opinion of a treating physician. *See Adams v. Astrue*, No. 1:07-cv-2543, 2008 WL 9396450, at *3, fn. 5 (citing *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004)). Nevertheless, ALJs must still conduct an analysis sufficient for the court to engage in a "meaningful review of the ALJ's application of the [treating physician] rule." *Wilson*, 378 F.3d at 544.

The parties do not dispute that Dr. Hayes was the plaintiff's treating physician. The record evidence shows that Dr. Hayes was the plaintiff's general practitioner from March 2008 until May 2011. In this capacity, Dr. Hayes treated the plaintiff for a variety of conditions.[3]

---

[3] Referring to the general practitioner she began seeing after she stopped receiving care from Dr. Hayes, the plaintiff described her general practitioner as the person who, "takes care of my high blood pressure, . . . takes care of my thyroid, . . . takes care of – I mean, anything that your general practitioner would do—anything you would go to your doctor for."  (Tr. 53.)

There is no evidence in the record that Dr. Hayes diagnosed the plaintiff's fibromyalgia or headaches or that he had any particular expertise in treating fibromyalgia or headaches.

There also is no evidence in the record identifying the medical provider who diagnosed the plaintiff with fibromyalgia.[4] The first time fibromyalgia appears in Dr. Hayes' clinic notes as an identified condition is June 18, 2009, after the plaintiff had been seeing Dr. Hayes for more than a year.[5] (Tr. 262.) At the same time, Dr. Hayes was working with the plaintiff to determine whether some of her symptoms were caused by restless leg syndrome rather than "neuropathic symptoms." (*Id.*) For the most part, the plaintiff saw Dr. Hayes for things like an accidental burn, (Tr. 243), chest congestion and coughing, (Tr. 236-38, 253), a spider bite, (Tr. 254-55), a chronic right ankle injury, (Tr. 258), her hypothyroidism, (Tr. 266-68, 274, 277), a fever (271-72), elevated blood pressure, (279), trouble sleeping and fatigue, (Tr. 277)[6] and frequently for medication refills (239, 258-60, 279).

The plaintiff moved to Montgomery, Alabama some time in 2009, seeing Dr. Hayes for the last time on July 21, 2009. (Tr. 260.) Almost exactly a year later, on July 19, 2010 the plaintiff started seeing Dr. Hayes again. Dr. Hayes' clinic notes state that, "[s]ince last here patient has been switched to a combination of Lyrica, Topamax and Fentanyl as her primary pain treatment." (Tr. 258.) Plainly, Dr. Hayes did not suggest this regimen, but he merely followed what another provider had, apparently, prescribed for the plaintiff.

---

[4] Although at the hearing, the plaintiff's counsel asked her to describe the pain she experiences from fibromyalgia, he did not ask her when she was diagnosed or by whom. (Tr. 46.)

[5] There is a record of a call the plaintiff made to Dr. Hayes' office on November 2, 2008 seeking additional Lyrica. A different doctor responded to her call and noted that "[p]atient states that she has fibromyalgia." (Tr. 270.)

[6] Notably, Dr. Hayes had scheduled the plaintiff for a sleep study. (Tr. 277.) The plaintiff claimed to have scheduling conflicts and did not appear for the study. (*id.*) Dr. Hayes noted that he would reschedule, (*id.*), but the evidence does not contain any record of the plaintiff's participating in a sleep study.

With regard to the plaintiff's chronic headaches, shortly before Dr. Hayes wrote his opinion letter, his clinic notes demonstrated that he felt unequipped to treat the plaintiff's headaches. On March 17, 2011, Dr. Hayes' clinic notes establish that, while he worked with the plaintiff to treat her headaches, the plaintiff was "over us[ing]" the medication he prescribed, Phrenilin, which "is definitely creating a rebound headache." (Tr. 241.) As a result, Dr. Hayes noted that he would find a headache specialist to whom he could refer the plaintiff because he felt "that she is going to have to see someone of this specialty as we cannot continue to write these large amounts of controlled pain medications." (*Id.*)

So Dr. Hayes was neither a fibromyalgia nor a headache specialist.[7] He did not diagnose the plaintiff with fibromyalgia, was not the primary provider treating her fibromyalgia, and does not appear to have any expertise in treating fibromyalgia.[8] Additionally, it is clear that Dr. Hayes felt that the effective treatment of the plaintiff's headaches was beyond his expertise. At the outset then, the ALJ reasonably could give less weight to Dr. Hayes' opinion. *See* 20 C.F.R. § 404.1527 (noting that "[w]e generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist"); *see also Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (noting that the regulations dictate that, "when the physician is a specialist with respect to

---

[7] While Dr. Hayes identified numerous other allegedly disabling conditions from which the plaintiff suffered, the ALJ found only fibromyalgia and headaches to be severe impairments. (Tr. 16.) The plaintiff does not contend that she was disabled by any of the additional conditions identified by Dr. Hayes. The plaintiff's claim that the ALJ failed to properly consider other impairments is discussed separately below.

[8] Notably, Spectrum Pain Clinics, where the plaintiff received pain treatment from January, 2012 to July 2012, diagnosed the plaintiff with "thoracic spondylosis." (*see e.g.* Tr. 316, 319.) Spondylosis "refers to degenerative changes in the spine." *See* Spondylosis, http://www.emedicinehealth.com/spondylosis/article_ em.htm (last visited 6/8/17). Thoracic Spondylosis refers to degenerative changes at the upper- and mid-back and "frequently does not cause symptoms." *Id.*

the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist.")

What is more, Dr. Hayes' letter is not so much a medical opinion—which would have required him to describe his medical findings regarding the plaintiff's conditions and symptoms—as it is his opinion, based on the plaintiff's subjective complaints, that the plaintiff is disabled. (*See e.g.*, Tr. 235, noting "*Patient states that she often has episodes where she has difficulty simply getting out of bed due to fatigue and pain*. With this type of symptomatology, it makes it very difficult for her to keep any type of job.") Social Security regulations state that "[o]pinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d) (providing a non-exhaustive list of examples of issues reserved to the Commissioner). For example, the SSA is responsible for making the determination about whether a claimant meets the statutory definition of disability. (*Id.* at §404.1527(d)(1).) Thus, "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* Moreover, the SSA "will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." *Id.* Dr. Hayes offered an opinion on a subject—whether plaintiff is disabled or not—expressly reserved to the SSA, rather than furnishing a treating physician opinion entitled to controlling weight. Therefore, Dr. Hayes' opinion that the plaintiff was unable to work was not entitled to "any special significance." *Id.*

Prior to considering Dr. Hayes' letter, the ALJ considered the plaintiff's testimony and the record evidence. (Tr. 17-19.) The ALJ noted that numerous basic facts undermined the plaintiff's credibility with respect to the intensity, persistence and limiting effects of her

symptoms: (1) the record is replete with notations that indicate that the plaintiff's medications and treatments were beneficial and "relatively effective in controlling the [plaintiff's] symptoms;" (2) the plaintiff submitted limited medical records that demonstrated limited treatment with respect to her severe impairments, and the records that were submitted establish that the plaintiff's physical examinations were largely normal with "no neurological deficits," "normal range of motion throughout all her extremities," and "she has been noted to have normal stability, normal strength and tone, and no effusion in her extremities;" (3) her activities of daily living "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations;" and (4) the plaintiff "received unemployment benefits until they ran out," and the plaintiff actually looked for work after her disability onset date, demonstrating that the plaintiff believed she was able to work. (Tr. 17-18.)

With this as background,[9] the ALJ found that Dr. Hayes' opinion was entitled to little weight because it was inconsistent with the plaintiff's testimony "that she can perform a wide range of daily activities, including caring for a 7 year old child, cooking, cleaning, driving, playing catch and volunteering." (Tr. 19.) The ALJ reasonably focused on the plaintiff's activities of daily living as an additional basis for discounting Dr. Hayes' opinion, because his opinion was based entirely on the plaintiff's subjective complaint that "she has difficulty getting out of bed, due to the fatigue and pain." (Tr. 235.) The ALJ could appropriately conclude that the plaintiff's wide range of daily activities, particularly as a single mother caring for her 7-year-old son, were inconsistent with Dr. Hayes' opinion that she was unable to work. *See Childress v. Comm'r of Soc. Sec.*, No. 2:14-cv-12399, 2015 WL 5752443, at *10 (E.D. Mich. June 24, 2015), report and recommendation adopted, No. 14-12399, 2015 WL 5729009 (E.D.

---

[9] See 20 C.F.R. § 404.1527(b) (medical opinions are to be evaluated in the context of the record as a whole).

Mich. Sept. 30, 2015) (finding that the ALJ properly concluded that the plaintiff's activities of daily living were inconsistent with her treating physician's opinion that she was completely unable to perform work activity within the residual functional capacity determined by the ALJ.)

Moreover, even if the ALJ's analysis of Dr. Hayes' opinion fell short, there is no basis for overturning the ALJ's decision. In *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001), for example, the challenged ALJ's decision failed to even mention a treating physician's "three-page summary of [the plaintiff's] medical history." The Sixth Circuit found that, "[a]lthough the ALJ should have included a reference to the [treating physician's] report in [his] findings, the failure to do so, in this case, was harmless error." *Heston*, 245 F.3d at 536. In so ruling, the Sixth Circuit pointed to the treating physician's admission in his report "that he had no current information on" the plaintiff, as well as his failure to provide any supportive medical records or "any objective basis for his conclusions." 245 F.3d at 535-36. Here, Dr. Hayes' opinion letter failed to note any medical findings or supporting records, offered no objective basis for his conclusion and, in any event, failed to offer a medical opinion at all. Instead, it simply made the leap to the unsubstantiated conclusion that the plaintiff could not work.

In sum, before assigning any weight to Dr. Hayes' opinion, the ALJ knew several important facts from which he could reasonably have concluded that Dr. Hayes' opinion was not entitled to any "special significance." 20 C.F.R. §404.1527(d)(1). First, Dr. Hayes was a general practitioner, not the plaintiff's primary treating provider for her fibromyalgia or headaches. Second, Dr. Hayes did not diagnose the plaintiff's headaches or fibromyalgia, and he lacked expertise in treating either condition. Third, Dr. Hayes did not offer a medical opinion, but rather opined about an ultimate fact—that the plaintiff was unable to work, a determination

within the exclusive province of the ALJ. [10]   Finally, Dr. Hayes did not cite to any supportive

medical records or any "medically acceptable clinical and laboratory diagnostic techniques," nor

did he set forth any objective basis for his conclusions.  20 C.F.R. § 404.1527(c)(2).  Indeed, Dr.

Hayes' opinion was based entirely on the plaintiff's subjective reporting of her complaints and

her conclusion that she could not work.   Accordingly, even if the ALJ erred in not more

extensively explaining the reasons for giving Dr. Hayes' opinion little weight, SSA Regulations

and case law dictated the outcome here, and the ALJ's overall analysis and consideration of the

medical evidence of record overcame any perceived deficiencies in his decision.  *See Shkabari v.*

*Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (explaining that "[n]o principle of administrative

law or common sense requires us to remand a case in quest of a perfect opinion unless there is

reason to believe that the remand might lead to a different result." (internal quotation marks and

alteration omitted)); *Kobetic v. Comm'r of Soc. Sec.*, 114 F.App'x. 171, 173 (6th Cir. 2004)

(recognizing that, "[w]hen remand would be an idle and useless formality, courts are not required

to convert judicial review of agency action into a ping-pong game." (internal quotation marks

omitted)).   The ALJ did not err in assigning little weight to Dr. Hayes' opinion letter and

sufficiently explained his reasons for doing so.

As her second claim of error, the plaintiff contends that the ALJ inappropriately deferred

to the opinions of non-examining physicians over the opinion of Dr. Hayes in determining the

plaintiff's residual functional capacity ("RFC") and failed to explain why.  Additionally, the

plaintiff claims that the ALJ failed to properly evaluate the opinion of consultative physical

examiner S. Mark Watson, M.D

---

[10] Dr. Hayes' statement that the plaintiff's inability to work was neither willful nor voluntary is
especially problematic, as it is not a medical opinion at all.  Even if it were, Dr. Hayes fails to
present any medical evidence to substantiate what is, at best, simply a reiteration of the
plaintiff's claim, and at worst, pure conjecture.

As fully explained above, the ALJ did not err in determining that Dr. Hayes' opinion was entitled to little weight.  Given that no treating physician opinion was entitled to controlling weight, the ALJ was required to review the other medical opinions pursuant to 20 C.F.R. § 404.1527(c)(2), which sets forth the factors the ALJ should consider when deciding the weight to give medical opinions, including the supportability of the opinion and the consistency of the opinion with the record as a whole.  Additionally, "Social Security regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, because these individuals are 'highly qualified' and are 'experts in Social Security disability evaluation.'" *Cobb v. Comm'r of Soc. Sec.*, No. 1:12–cv–2219, 2013 WL 5467172, at *5 (N.D. Ohio Sept. 30, 2013) (quoting 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i)); *see also Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

However, the Sixth Circuit has long held that, "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another."  *Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *9 (N.D. Ohio Sept. 30, 2016) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006).  Likewise, the ALJ is "under no special obligation" to provide great detail as to why the opinions of the nonexamining providers "were more consistent with the overall record" than the examining, but nontreating, providers.  *Norris Comm'r of Soc. Sec.*, 461 F.App'x 433, 440 (6th Cir. 2012).  As long as "the ALJ's decision adequately explains and justifies its determination as a whole, it satisfies the necessary requirements. . . ."  *Id*.

The plaintiff did not submit any records from any mental health providers.  As such the ALJ considered the opinions of the state agency medical consultants.  The ALJ considered the

opinion of Marvin Blase, M.D. (Tr. 295-307), who completed a Psychiatric Review Technique form (PRTF) and found that the plaintiff had no medically determinable mental impairments. (Tr. 307.)  The ALJ also considered the opinion of Horace F. Edwards, Ph.D., who completed a PRTF and noted that the plaintiff's "[p]rimary limitations are physical." (Tr. 220)  Having little else to rely on in considering whether the plaintiff had any mental health limitations, the ALJ found that these opinions were entitled to substantial weight because they were consistent with the record evidence, or lack thereof, and because the plaintiff did not identify impairments caused by "any psychiatric conditions."  (Tr. 19.)  Substantial evidence supported the ALJ's finding.

With respect to the plaintiff's physical limitations, the ALJ considered the physical RFC ("PRFC") assessment prepared by P. Stumb, M.D. on December 30, 2010.  After noting that the plaintiff was taking a significant number of narcotic painkillers and that she was receiving narcotic painkillers from more than one physician at the same time,[11] Dr. Stumb opined that the plaintiff could occasionally lift and carry 20 lbs., could frequently lift and carry 10 lbs., could stand or walk about 6 hours in an 8-hour work day, could sit about 6 hours in an 8-hour work day, she had no push/pull restrictions, no postural limitations, no manipulative or visual

---

[11] Curiously, on June 12, 2008, the plaintiff advised Dr. Hayes that her Opana medication, a medication she did not normally receive from Dr. Hayes, was stolen while she was at the grocery store.  The plaintiff did not report the incident to the police.  The plaintiff claimed that she was worried about going into withdrawal before she could obtain a refill from the pain clinic where she obtained the original prescription.  Dr. Hayes gave the plaintiff a prescription for Opana.  On March 16, 2010, the plaintiff visited Nicolas C. Pantaleone, M.D., her other provider who was located in Alabama, and made the same claim—her purse was stolen and she needed a refill on her medication.  While it is not clear which medication the plaintiff claimed was stolen in March, 2010, Dr. Pantaleone routinely prescribed Opana.  (Tr. 204; *see also* 205-07.)  Opana (oxymorphone) is a highly addictive opioid pain medication.  *See* Opana Prescribing Information, Endo Pharmaceuticals, Rev. 12/2016 located at http://www.endo.com/File%20Library/Products/Prescribing%20Information/OPANA_prescribing_information.html (last visited 6/14/17).

limitations, and no communicative or environmental limitations. (Tr. 227-30.) Dr. Stumb based his opinion in part on his observation that the medical records showed only "[o]ccasional partial [musculoskeletal] exams by Dr. Hayes with no abnormalities noted . . . [and] [n]o characterization of headaches other than to call them "[m]igraines." (Tr. 233.) Dr. Stumb further noted:

> Fibromyalgia: No absolute confirmation of diagnosis in [medical evidence of record] . . . but [third party] has given [fibromyalgia] as a [diagnosis]
>
> Migraine [headaches]: No description in [medical evidence of record], apparently managed with cl[aimant's] narcotics and the Esgic-plus,[12]
>
> H[igh] B[lood] P[ressure]: Well-controlled on medication, no evidence of [established onset date],
>
> Non-severe R[heumatoid] A[rthritis]: Not characterized or tested for in the [medical evidence of record]. Not a [medically determinable impairment].

> The degree of the Cl[aimant]'s complaints of pain is not considered fully credible. She performs all of her [activities of daily living] admittedly taking more time than in the past but without significant difficulty. The ability to perform such a variety of daily activities tends to negate the credibility of these subjective complaints, especially the degree of pain said to be experienced by the Cl[aimant] and her requirement of daily Narcotics.

(*Id.*) The ALJ gave Dr. Stumb's PRFC assessment great weight because he found that it was "consistent with the medical record of evidence, which shows the claimant to have no neurological deficits, the ability to ambulate successfully, and no limitations in her range of motion." (Tr. 18.)

---

[12] Esgic-plus, also called Fioricet, is a combination barbiturate and stimulant comprised of acetaminophen, butalbital and caffeine. It is used to treat headaches. *See* Butalbital, Acetaminophen, and Caffeine (Oral Route), Mayo Clinic Mar. 1, 2017 located at http://www.mayoclinic.org/drugs-supplements/butalbital-acetaminophen-and-caffeine-oral-route/description/drg-20075393 (last visited 6/13/17).

The ALJ also considered the "Case Analysis" conducted by J. Kleppel on November 14, 2011. (Tr. 19, 294.) In preparing the Case Analysis, which was prepared nearly a year after Dr. Stumb's RFC assessment, Consultant Kleppel considered all medical evidence of record to the date of his review, but found that the plaintiff's condition was not substantially different and had not declined since Dr. Stumb's RFC assessment. (Tr. 294.) As a result, Dr. Stumb's RFC assessment was affirmed as written. (*Id.*)

The plaintiff protests, however, that Dr. Watson's opinion should have been given more weight than the two consultative evaluators. On November 9, 2011, Dr. Watson, rather cursorily, examined the plaintiff. (Tr. 281-87.) Dr. Watson did not treat the plaintiff and there is no indication that he had ever treated the plaintiff. (*Id.*) He completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)" form, to which he attached the results of his physical examination of the plaintiff. (*Id.*) Based on the plaintiff's subjective complaints, Dr. Watson noted that she has "chronic fatigue, mixed connective tissue disease and fibromyalgia" which, she explained "began about 3 years ago and has progressively worsened." (Tr. 285.) Nevertheless, Dr. Watson found that she had no cyanosis, clubbing or edema in her extremities, "[c]ranial nerves II-XII, strength, sensation, deep tendon reflexes, gait, coordination, and [straight leg raises] are all normal" and although he found 16/18 trigger point tenderness,[13] he also found that she had a full-range of motion in her cervical spine, dorsolumber spine, shoulders, elbows, hips, knew, ankles, wrist, hands and fingers. (Tr. 282-83.) Dr. Watson concluded that the plaintiff could perform sedentary work. (Tr. 19.) There is no indication that

---

[13] Notably, localization of trigger points appears to be partly in the objective hands of the physician and partly in the subjective hands of the patient. *See* Alvarez, D.J., Rockwell, P.G., *Trigger Points: Diagnosis and Management*, Am. Fam. Physician, 2002 Feb. 15;65(4):653-60 located at http://www.aafp.org/afp/2002/0215/p653.html (last visited 6/13/17) (explaining that "[l]ocalization of a trigger point is based on the physician's sense of feel, assisted by patient expression of pain and by visual and palpable observations of local twitch response.")

Dr. Watson reviewed any of the medical evidence of record or that he received any information about the plaintiff's medical history, other than what the plaintiff told him.  (Tr. 281-87.)

After reviewing the record as a whole, the ALJ gave Dr. Watson's opinion little weight for the same reasons he gave Dr. Hayes' opinion little weight.  Dr. Watson's opinion that the plaintiff could only do sedentary work was inconsistent with the medical evidence of record and inconsistent with the plaintiff's testimony that she was able to accomplish a wide-range of activities of daily living.  (Tr. 19.)  Additionally, the record demonstrates that before preparing his opinion as to the plaintiff's limitations, Dr. Watson did one thing—he briefly examined the plaintiff.  There is no evidence that Dr. Watson had any information about the plaintiff's medical history, other than what she told him, or that he had reviewed any of the medical records in evidence.  By contrast, while neither Dr. Stumb nor Consultant Kleppel examined the plaintiff, they both reviewed the medical evidence of record to the date of their opinions, which, with respect to Consultant Kleppel, was after Dr. Watson's examination of the plaintiff.  As such, they had a more complete understanding of the plaintiff's medical history than did Dr. Watson.   It was therefore reasonable for the ALJ to give their opinions more weight than that of Dr. Watson.  *See also Brooks*, 531 F.App'x. at 642 (noting that "in appropriate circumstances, opinions from State agency medical and psychological consultants     . . . may be entitled to greater weight than the opinions of treating or examining sources.  One such instance is where the 'State agency medical or p[s]ychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.'" (internal citation omitted)); *Goddard v. Berryhill*, No. 1:16cv1389, 2017 WL 2190661, at *17 (N.D. Ohio May 1, 2017), report and recommendation adopted *sub*

*nom. Angela Goddard v. Comm'r of Soc. Sec.,* No. 1:16 cv 1389, 2017 WL 2155391 (N.D. Ohio May 17, 2017)(citing *Barker v. Shalala,* 40 F.3d 789, 794–95 (6th Cir. 1994)) (explaining that "[a]n ALJ's reliance on the opinion of a non-examining medical expert is proper if the expert's opinion is based on objective reports and opinions").

As her third claim of error, the plaintiff claims that the ALJ failed to properly weigh the opinion of the certified physician's assistant ("PA-C") Amy Akerman, who worked at the America's Family Doctors ("AFD") clinic, and who became the plaintiff's general practitioner after she left Dr. Hayes' care.

Under the Regulations, an ALJ must consider all of the evidence in a plaintiff's record. *See* 20 C.F.R. § 404.1520(a)(3) (stating "[w]e will consider all evidence in your case record when we make a determination or decision whether you are disabled."). However, ALJs are not required to discuss each piece of evidence in their decision, "so long as they consider the evidence as a whole and reach a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec.,* 397 F.App'x. 195, 199 (6th Cir. 2010) (citing *Kornecky,* 167 F.App'x. at 507-08). The ALJ expressly stated that he considered opinion evidence in accordance with SSA Regulation and Rules, (Tr. 17), and, although not identified in the decision, the ALJ attached as an exhibit all of the evidence of record that he considered in making his decision, including PA-C Akerman's mental and physical medical source statements. (Tr. 21-24.)

With respect to PA-C Akerman's opinion, it must first be noted that as a physician's assistant, she was not an "acceptable medical source."[14] The plaintiff testified that she saw PA-C Akerman as her general practitioner for all her general health complaints. (Tr. 53) There is no

---

[14] Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. 20 C.F.R. § 404.1513(d).

evidence in the record to suggest that PA-C Akerman was a specialist in treating fibromyalgia or headaches. Moreover, contrary to the plaintiff's testimony, the plaintiff did not actually receive care from PA-C Akerman every time she visited the AFD clinic. (Tr. 52-54; *see also* Tr. 419-39, noting Ronda Kopra PA-C as the plaintiff's provider.) Indeed, record evidence demonstrates that, as of the date of the hearing, October 20, 2012, the plaintiff had seen PA-C Akerman two times—once for sinus congestion, stuffy nose and a prescription refill and once for vertigo and a prescription refill. (Tr. 415-18.) The evidence demonstrates that the lion's share of the plaintiff's visits to the AFD clinic were for prescription refills and conditions entirely unrelated to the plaintiff's fibromyalgia or headaches. (*See e.g.* medication refills Tr. 419-20, 428-35, 438-39; unrelated medical conditions Tr. 421-25, 436-37, 440-41).[15] At the outset then, even if the treating physician rule applied to PA-C Akerman's opinion regarding the plaintiff's mental and physical limitations, it is unlikely that, after only two visits dealing with medical issues entirely unrelated to the plaintiff's severe impairments, PA-C Akerman could be considered a treating provider. *See Kornecky*, 167 F. App'x at 506-07 (collecting cases and recognizing that it is well established that a single visit fails to establish an ongoing treatment relationship. "Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship.")

---

[15] From December 16, 2011 through January 16, 2012, the plaintiff visited the AFD clinic 5 times for refills on her Percocet prescription. (Tr. 428-37.) At each visit except the last, she was prescribed 40 pills which clinic notes state were supposed to last for 7-10 days. The plaintiff was at the clinic in 7 days or less every time she sought a refill. Percocet is a semisynthetic opioid at high risk for addiction and dependence. *See* Percocet, Prescribing Information, Endo Pharmaceuticals, Aug., 2016 at http://www.endo.com/file%20library/products/prescribing%20information/percocet_prescribing _information.html (last visited 6/14/17).

Turning to PA-C Akerman's actual opinions, she opined that the plaintiff had no mental health impairments that would limit her ability to work. (Tr. 459-61.) As to her opinion regarding the plaintiff's physical limitations, PA-C Akerman noted extreme limitations. (Tr. 457-58.) For example, PA-C Akerman opined that the plaintiff could lift and carry less than 10 lbs, could stand or walk less than 2 hours, that she must alternate her position every 20 minutes, that she could stand for only 30 minutes before having to change position, that she had to walk around every 20 minutes but could only walk for 5 minutes each time and that she would ordinarily have to lay down during the work day. (Tr. 457.) PA-C Akerman noted that the plaintiff's rheumatoid arthritis, fibromyalgia, daily headaches, including migraines and chronic back pain supported her opinion regarding the plaintiff's extreme limitations. Given that none of the medical records from the AFD clinic evidence any clinical or laboratory testing or diagnostics related to any of these conditions, and, in particular, PA-C Akerman's clinic notes do not evidence any objective testing or diagnostics regarding these conditions, it is reasonable to believe that PA-C Akerman based her opinion solely on the plaintiff's accounts of her medical history and subjective complaints. As such, PA-C Akerman's opinion was not entitled to any "special significance" at all. 20 C.F.R. §404.1527(d)(1)). But, even if it were, it would be entitled to little weight because her opinion is entirely bereft of any objective medical findings, and the medical evidence of record is inconsistent with such extreme limitations.

As her fourth and final claim of error, the plaintiff contends that the ALJ failed to consider as severe impairments her bronchitis, rheumatoid arthritis, chronic pain syndrome, major depressive disorder, thoracic and lumbar spondylosis and cervicalalgia. As an initial matter, the plaintiff does not cite to a single piece of medical evidence in the record to support her contention that she is afflicted with any of these conditions or that she ever claimed that these

conditions were limiting her ability to work.  In her initial disability report submitted July 15, 2010, the plaintiff claimed that she suffered from fibromyalgia, chronic migraines, and high blood pressure.  (Tr. 137.)  In an updated disability report submitted on September 15, 2011, the plaintiff claimed that she suffered from depression and anxiety as new mental limitations and that she suffered from rheumatoid arthritis and chronic bronchitis/Chronic Obstructive Pulmonary Disease (COPD) as new physical limitations.  (Tr. 166.)  The plaintiff's contention regarding rheumatoid arthritis is particularly odd, given that, on April 13, 2011, months before her updated disability report, the plaintiff was expressly advised by Dr. Hayes that he had spoken to her rheumatologist who advised Dr. Hayes that the plaintiff did not have rheumatoid arthritis. (Tr. 239.)  Also troubling is the plaintiff's unsupported claim that major depressive disorder limits her ability to work, despite opinions by a number of medical providers, (Tr. 288-93, 295-307), including the plaintiff's own provider (Tr. 459-61), indicating that the plaintiff was not limited by any mental health impairments, not to mention that the plaintiff has never been treated for any mental health impairment.

The plaintiff has the burden of showing that she had a severe impairment that met the twelve-month duration requirement.  *See Harley v. Comm'r of Soc. Sec.*, 485 F.App'x 802, 803 (6th Cir. 2012).  "To meet this burden, [she] must show that [she] has an impairment that has lasted or is expected to last for a continuous period of at least twelve months and that [her] impairment has significantly limited [her] ability to do basic work activities."  *See id.*, *see also* 20 C.F.R. §§ 404.1509, 404.1521, 416.909, 416.921.  The plaintiff never expressly raised as disabling impairments bronchitis, chronic pain syndrome, major depressive disorder, thoracic and lumbar spondylosis and cervicalalgia.  Even if she had, she points to no evidence in the medical record that would have supported her claim that these impairments existed, that they met

the durational requirement and that they limited her ability to work. Indeed, except for rheumatoid arthritis, which the medical evidence affirmatively establishes the plaintiff did not have, (Tr. 239), the two medical opinions in the record from plaintiff's providers did not identify any of these conditions as impairments. (Tr. 235, 457-58.)

Additionally, while each of these conditions may appear somewhere in the medical evidence of record, the plaintiff does not cite to any evidence that any of these conditions satisfies the durational requirement, nor does she establish that any of these conditions "significantly limited her ability to do basic work activities." *Harley*, 485 F.App'x at 803. With respect to chronic bronchitis, the plaintiff visited Dr. Hayes on September 24, 2010 with a cough and congestion and was diagnosed with bronchitis.[16] (Tr. 253.) Dr. Hayes prescribed several medications. (*Id.*) On her next visit to Dr. Hayes on October 8, 2010, there is no mention of bronchitis, presumably because her bronchitis had resolved with treatment. (Tr. 254.) Bronchitis does not appear again in Dr. Hayes' clinic notes until May 2, 2011, when the plaintiff visited him complaining of a cough and that her chest hurt. (Tr. 238.) Dr. Hayes again prescribed several medications. (*Id.*) Twelve days later, on May 18, 2011, the plaintiff saw Dr. Hayes again complaining of cough and congestion. (Tr. 236-37.) The plaintiff did not see Dr. Hayes again after May 18, 2011. The plaintiff did not see another general practitioner until she visited the AFD clinic on November 16, 2011 to establish care at the clinic. (Tr. 440.) The plaintiff again complained of cough and congestion, which she claimed had been on-going for two weeks. (*Id.*) The plaintiff was again given medication and, by her next appointment on December 9, 2011, there was no mention of bronchitis in the AFD clinic notes. (Tr. 438.) There is no further mention of the plaintiff's having bronchitis in any other clinic notes from the AFD

---

[16] It is worth noting that the plaintiff is a smoker, who smokes from one-half to one whole pack of cigarettes per day. (Tr. 423, 440.)

clinic through August 24, 2012, the last date for which there are clinic notes. Thus, even if the ALJ considered chronic bronchitis as a disabling impairment, the plaintiff has not established that this condition satisfied the duration requirement or that it limited her ability to do basic work activities.

With respect to chronic pain syndrome, this diagnosis does not appear until December 16, 2011, at which time the AFD provider began prescribing Percocet and noted that, "[w]e are providing this medicine every 7-10 days until her app[ointmen]t with pain management in January." (Tr. 437.) At each visit from December 16, 2011 through January 10, 2012, the entire period of time for which the AFD provider prescribed Percocet, the AFD clinic notes reflect a diagnosis of chronic pain syndrome. (Tr. 430-35.) On January 10, 2012, the AFD provider noted, "this should be the last [Percocet] refill until [the plaintiff] goes to [p]ain management." (Tr. 430.) The plaintiff was given one more Percocet refill, on January 16, 2012, after she claimed that her pain clinic appointment was not until January 18, 2012. (Tr. 428.) Chronic pain syndrome is again identified as the diagnosis supporting the Percocet prescription. (Tr. 429.) Chronic pain syndrome does not appear in AFD clinic notes after January 16, 2012, corresponding with the end of the Percocet prescriptions from the AFD clinic. There are no medical records in evidence demonstrating that the plaintiff visited a pain clinic on January 18, 2012. Indeed, the plaintiff does not appear to have visited a pain clinic until October 2, 2012, at which time she identified chronic pain as an "active" problem. There are no medical records in evidence after October 3, 2012. Even if the court presumes that the AFD clinic diagnosed the plaintiff with chronic pain syndrome for reasons other than to support their Percocet prescriptions, there are insufficient medical records in evidence to establish the durational requirement, and the plaintiff has not established that this condition limited her ability to work.

Finally, a provider at the Spectrum Pain Clinic, where the plaintiff received pain treatment from January 2012 to July 2012, diagnosed the plaintiff with "thoracic spondylosis." (*see e.g.* Tr. 316, 319.)   There is no evidence in the record demonstrating that the plaintiff continued to receive treatment for this condition after she was discharged from the Spectrum Pain Clinic for irregularities related to her narcotic pain medication.   (*see* Tr.   315-16.) Therefore, the plaintiff cannot meet the durational requirement, and again, fails to establish that this condition limited her ability to work.

Based on the foregoing, the ALJ's decision that the plaintiff was not disabled is supported by substantial evidence in the record as a whole.   Accordingly, the ALJ's decision will be affirmed.

## V.  Conclusion

In light of the foregoing, the plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED.   An appropriate order is filed herewith.

It is so ORDERED.

ENTER this 24th day of August 2017.

ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE